UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARY M. CARNEY, | CASE NO. C21-415 MJP |
| Plaintiff, | ORDER DENYING MOTION TO REMAND |
| v. | |
| STATE OF WASHINGTON; WASHINGTON STATE PARKS AND RECREATION COMMISSION; and SWINOMISH INDIAN TRIBAL COMMUNITY, | |
| Defendants. | |

Before the Court is Plaintiff's motion to remand.  (Dkt. No. 21.)  Having considered the motion and all related papers, (Dkt. Nos. 1, 21, 22, 32, 33, 34), the Court finds that it has subject-matter jurisdiction over this proceeding and DENIES the motion to remand.

**BACKGROUND**

This is a property dispute over a small strip of land on the Swinomish Indian Reservation between Kiket Island and Fidalgo Island in Skagit County.  Plaintiff Mary Carney owns waterfront property at 15466 Snee Oosh Rd.  (Dkt. No. 1, Attach. 2, "Amended Complaint.")

1    Washington State and the United States co-own, in fifty-percent shares as tenants in common,

2    land adjacent to Ms. Carney's property, directly to the north (on Fidalgo Island) and west (on

3    Kiket Island).  (Id. at 2.)  The United States holds its fifty-percent ownership in trust for the

4    Swinomish Indian Tribal Community.  (Id.)  The United States also owns the tidelands—

5    surrounding Kiket Island, on both sides of the strip of land at issue, and abutting the

6    southwestern edge of Ms. Carney's property—in trust for the Tribe.  (Dkt. No. 1 at 3.)  The land

7    co-owned by Washington State and the United States is co-managed by the Washington State

8    Parks and Recreation Commission and the Swinomish Indian Tribal Community as Kukutali

9    Preserve, which was established in 2010.  (Am. Compl. at 2.)

10        The dispute centers on Kiket Island Road, which connects Fidalgo Island with Kiket

11   Island.  (See Am. Compl., Ex. B.)  A section of Kiket Island Road is on a type of land formation

12   called a tombolo, which is created when deposits accrue such that an island becomes connected

13   to a mainland or another island through a spit or bar.  In 2018, the Kukutali Preserve began a

14   restoration project in which it removed portions of Kiket Island Road.  According to the

15   Preserve: "The roadway was an artificial—and unpermitted—dam in the intertidal zone and

16   needed to be removed in order to reestablish more natural morphology in the area (including

17   improved water, wood, and sediment transport), to improve fish and wildlife forage and

18   migration, and to facilitate Tribal members' subsistence and cultural practices such as gathering

19   shellfish." (Dkt. No. 1 at 3.)  The Preserve argues that the road was created in part through

20   artificial fill, which disrupted the flow of the tides.  Removing that fill apparently resulted in the

21   road being submerged at high tides.

22        Ms. Carney claims Defendants trespassed on her property through their restoration

23   project and increased inundation on her property, another form of trespass.  (Am. Compl. at 8.)

24

1    She also claims she owns rights under an easement along Kiket Island Road and that the Preserve

2    interfered with those rights.  She argues that she has a recorded easement benefitting her property

3    and burdening the Preserve, or, in the alternative, that she has such an easement by prescription.

4    (Am. Compl. at 7.)  Her claims are for trespass, blocking an easement, negligence, nuisance,

5    outrage, and negligent infliction of emotional distress and to quiet title.  (Am. Compl. at 8–12.)

6    She seeks to quiet title to her property and also asks for injunctive relief directing Defendants to

7    restore the portion of Kiket Island Road "adjacent to the Carney Property to its original elevation

8    and maintain that portion of [the road] in an unobstructed condition, to not otherwise interfere

9    with plaintiff's easement burdening the Preserve Property, and to take no further actions that

10   increase flooding of the Carney Property."  (Am. Compl. at 12–13.)  Ms. Carney also seeks

11   damages on various grounds.

12           The Swinomish right to the tidelands was recognized in the Treaty of Point Elliot, in

13   1855, in which they ceded portions of land in exchange for the Reservation.  12 Stat. 927.  This

14   right was further recognized and expanded in an executive order issued by President Ulysses S.

15   Grant, in 1873.  (See Dkt. No. 12, Declaration of Emily Haley, "Haley Decl.," Ex. 1.)  Under

16   federal law, the upper boundary of any tidelands is the mean high-water line, which is

17   determined by projecting onto the shore the average of all high tides over a period of 18.6 years.

18   Borax Consol. v. City of Los Angeles, 296 U.S. 10, 26–27 (1935); see United States v. Milner,

19   583 F.3d 1174, 1181 (9th Cir. 2009).  Although the mean high-water line establishes the

20   boundary of tidelands, that line also changes through natural occurrences.  These changes

21   correspond to changes in property rights: "Under the common law, the boundary between the

22   tidelands and the uplands is ambulatory; that is, it changes when the water body shifts course or

23

24

1   changes in volume." Milner, 583 F.3d at 1187.  Upland owners may lose property to tidelands

2   owners through erosion, whereas tidelands owners may lose property to accretion.  Id.

3           Article 7 of the Treaty of Point Elliott authorized the President to survey reserved lands

4   and assign lots to individuals or families.  12 Stat. 927.  The United States most recently

5   surveyed the area in 2010.  (Dkt. No. 22, Declaration of Jennifer A. MacLean, "MacLean Decl.,"

6   Ex. E.)  Government Lots 2, 3, 5, 6, 7, 8, and 9—making up nearly all of Kiket Island plus the

7   two adjacent lots on Fidalgo Island—were assigned to a Swinomish family in 1885 through a

8   federal patent.  (Dkt. No. 22, Ex. C.)  Those lots subsequently passed into private ownership.

9   Washington State and the Tribe, as tenants in common, purchased Government Lots 5, 6, 7, 8,

10  and 9, plus a subdivision of the original Government Lot 2, in 2010 to create the Preserve.  (Am.

11  Compl., Ex. E.)  The Tribe then transferred its interest to the United States to hold in trust.

12          Ms. Carney traces her property to the 1885 federal patent—specifically, to a subdivision

13  of what was Government Lot 3.  Government Lots 2 and 3 were sold by minor heirs to the

14  original owner at probate in 1929.  (Am. Compl., Ex. A.)  That sale stated that Government Lots

15  2 and 3 were subject to an easement which Ms. Carney now claims gives her the right of access

16  along Kiket Island Road:

17          A right of way and easement upon and over the south 30 feet of Government Lot 2, Sec.
            21 . . . for the common benefit of the owners of Government Lots 2, 3, 5, 6, 7, 8 and 9 of
18          Sec. 21 . . . as a road for ingress and egress to the public road, said road to be by the
            Grantee established by the reservation of the East 30 feet of Government Lots 2 and 3
19          . . . and to connect with present road at or beyond the South extremity of said
            Government Lot 3, together with the right to construct, land and maintain water pipe lines
20          beneath the surface of the ground, and telephone and power lines along said right of way
            easement.

21
22  Id.  The importance of the easement here is that, according to Ms. Carney, the owners of

23  Kukutali Preserve—the United States, in trust for the Tribe, and Washington State—took

24  possession of Government Lots 3 and 9 subject to it.

1    Under Ms. Carney's theory, she has access rights under an easement running along Kiket

2  Island Road, and the Preserve's property (Government Lot 9, on Kiket Island, and the

3  subdivision of the original Government Lot 2, on Fidalgo) is burdened by the easement.

4  However, from the Tribe's perspective, at least part of Kiket Island Road is tideland, owned by

5  the United States in trust for the Tribe.  Because the Tribe's rights to the tidelands precede any

6  alienation of Reserve lands and were never themselves alienated or conceded, they would not be

7  subject to the easement.

8                                         ***

9    The Tribe removed, (Dkt. No. 1), with the consent of the State, (Dkt. No. 32.).  The Tribe

10  also moved to dismiss before Ms. Carney moved to remand.  (See Dkt. No. 10.)  However,

11  because the Court must first ascertain jurisdiction, the Court re-noted the Tribe's motion to

12  dismiss.  (Dkt. No. 31.)

13                          **DISCUSSION**

14    In its notice of removal, the Tribe identified two bases for federal jurisdiction.  First, the

15  Tribe removed under 28 U.S.C. § 1441(a), because the Court would have original jurisdiction for

16  cases arising under federal law.  See 28 U.S.C. § 1331.  Second, the Tribe removed under 28

17  U.S.C. § 1442(a)(2), which permits removal for certain civil actions by "a property holder whose

18  title is derived from any [United States] officer, where such action or prosecution affects the

19  validity of any law of the United States."  The Court considers these statutes in turn and

20  concludes that there is jurisdiction on multiple grounds.  There is federal-question jurisdiction

21  under 28 U.S.C. § 1441(a) for two independent reasons.  There is jurisdiction because at least

22  two of Plaintiff's claims necessarily depend on the resolution of substantial federal issues.  There

23  is also jurisdiction under the doctrine of complete preemption because Plaintiff asserts property

24

1  interests which contest the Tribe's aboriginal right to the tidelands.  The Court also finds that

2  there is jurisdiction under 28 U.S.C. § 1442(a)(2).

3  **I.    Federal Question Jurisdiction**

4         A case arises under federal law if (1) federal law creates the cause of action or (2) the

5  plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal

6  law.  E.g., Cook Inlet Region, Inc. v. Rude, 690 F.3d 1127, 1130 (9th Cir. 2012).  Federal law

7  creates the cause of action if one of the essential elements of the plaintiff's claim is based on

8  federal law.  E.g., King County v. Rasmussen, 299 F.3d 1077, 1082 (9th Cir. 2002) (suit to quiet

9  title where claim to property depended on federal law).  In contrast, a federal defense to a state-

10  law claim does not create federal jurisdiction.  E.g., Getz v. Boeing Co., 654 F.3d 852, 860 (9th

11  Cir. 2011).  It only takes one claim "arising under" federal law to establish jurisdiction.  See

12  Wisconsin Dep't of Corrections v. Schacht, 524 U.S. 381, 386 (1998).

13         **A.    Substantial federal question**

14         Federal jurisdiction arises if a plaintiff's right to relief depends on the resolution of a

15  substantial question of federal law.  Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545

16  U.S. 308, 312 (2005) ("in certain cases federal-question jurisdiction will lie over state-law claims

17  that implicate significant federal issues").  There are several factors the claim must satisfy: (1)

18  the federal issue must be necessarily raised, (2) actually disputed, (3) substantial, and (4) capable

19  of resolution in federal court without disrupting the federal-state balance approved by Congress.

20  Id. at 314.

21         A federal question is a "substantial one" where it "indicat[es] a serious federal interest in

22  claiming the advantages thought to be inherent in a federal forum."  Provincial Gov't of

23  Marinduque v. Pacer Dome, Inc., 582 F.3d 1083, 1086–86 (9th Cir. 2009).  In contrast, a claim is

24

ORDER DENYING MOTION TO REMAND - 6

1   "jurisdictionally insubstantial if it is patently without merit, or so insubstantial, improbable, or

2   foreclosed by Supreme Court precedent as not to involve a federal controversy." Demarest v.

3   United States, 718 F.2d 964 (9th Cir. 1983).

4          The Tribe's rights to the tidelands is an issue of federal law.  See United States v. Milner,

5   583 F.3d 1174, 1182 (9th Cir. 2009) (tidelands); Wilson v. Omaha Indian Tribe, 442 U.S. 653,

6   671–72 (1979) (right to possession of unalienated reservation lands).  The amended complaint

7   necessarily raises the Tribe's rights to the tidelands and shows that Plaintiff disputes their rights.

8   The amended complaint refers to, and disputes, the Tribe's position that portions of Kiket Island

9   Road are tidelands.  (Am. Compl. at 7, 8.)  Plaintiff seeks to vindicate her rights under an

10  easement over an area the Tribe alleges includes tidelands.  (Id. at 9–10.)  She also seeks an

11  injunction directing the Tribe to restore Kiket Island Road, even though the Tribe alleges that

12  portions of the road are tidelands.  And Ms. Carney also seeks to quiet title to her entire property.

13  (Id. at 12.)  The description of her property expressly excludes all tidelands.  (Id. at 2.)  Because

14  she has waterfront property, part of her property line is the mean high-water mark.  Determining

15  that boundary requires ascertaining where the tidelands are.

16         It does not take a lot to conclude that the Tribe's right to the tidelands is a substantial

17  issue from the perspective of federal law.  President Grant's executive order addressed these

18  rights specifically.  (See Haley Decl., Ex. 1.)  And courts have long recognized the significance

19  of determining disputes over Indian rights to tidelands or other lands under federal law.  See

20  Milner, 583 F.3d at 1182 (Lummi tidelands); Oneida Indian Nation v. Cnty. of Oneida, 414 U.S.

21  661, 677 (1974) ("federal law now protects, and has continuously protected from the time of the

22  formation of the United States, possessory rights to tribal lands, wholly apart from the

23

24

1  application of state law principles which normally and separately protect a valid right of

2  possession").

3        Finally, resolving the Tribe's rights as they relate to the tidelands in federal court would

4  not upset the federal-state balance.  If anything, Congress has expressed a preference to make

5  federal courts available to Indian tribes and has singled out Indian property rights as particularly

6  important.  For example, no state court can adjudicate title to Indian land held in trust by the

7  United States under the Quiet Title Act, 28 U.S.C. § 1360(b).  In contrast, federal courts have

8  original jurisdiction over civil actions brought by Indian tribes.  28 U.S.C. § 1362.  See Arizona

9  v. San Carlos Apache Tribe of Ariz., 463 U.S. 545, 559 n.10 (1983) (the legislative intent behind

10  28 U.S.C. § 1362 "reflected a congressional policy against relegating Indians to state court when

11  an identical suit brought on their behalf by the United States could have been heard in federal

12  court").  Finally, there is no indication that permitting federal jurisdiction for this category of

13  claims—seeking possessory rights or other property interests in Indian lands held in trust by the

14  United States—would "herald[] a potentially enormous shift of traditionally state cases info

15  federal courts."  Nevada v. Bank of Am. Corp., 672 F.3d 661, 676 (9th Cir. 2012).

16        Plaintiff argues that her claims are exclusively based on state law and that any federal-

17  law issues are raised only as a defense, which does not create jurisdiction.  As an initial matter, it

18  is worth pointing out that Grable & Sons concerned a suit to quiet title in which the defendant

19  removed on the basis that the plaintiff's claim to title was premised on a disputed interpretation

20  of federal tax law.  545 U.S. 308 (2005).  See also Hornish v. King Cty., 899 F.3d 680, 689 (9th

21  Cir. 2018) (jurisdiction for quiet title action where state-law rights depended on construction of

22  federal statute).  Here, Plaintiff's claims necessarily raise the Tribe's rights under federal law

23  because her property shares borders with tidelands and with the Preserve.  The relief she seeks

24

1   will necessarily involve deciding where the tidelands are, including on Kiket Island Road and at

2   the edge of her waterfront property.  The federal aspects to this dispute are not merely raised as a

3   defense.  They will determine the most significant aspects of the relief sought.

4        Many of Plaintiff's objections presuppose she is correct on the merits.  For example,

5   Plaintiff argues: "In fact, the only reason that there is any title dispute in this action is because

6   the Preserve indisputably excavated a strip of land that is part of [Plaintiff's] recorded property."

7   (Dkt. No. 21 at 8.)  Similarly: "[Plaintiff's] state law complaint does not allege a present right to

8   possession of Indian lands; it asserts a present right to possession of patented land."  (Dkt. No. 21

9   at 13.)  These arguments beg the question—areas Plaintiff claims as her property, or subject to

10  her property rights under an easement, the Tribe claims as tidelands or part of the Preserve.

11       Given this analysis, the Court finds there is federal-question jurisdiction under the Grable

12  & Sons principles for at least two of Plaintiff's claims.  Plaintiff's claim to quiet title to the

13  entirety of her property necessarily depends on defining the Tribe's right to the tidelands that

14  border her property.  Similarly, Plaintiff's claim to enforcing her easement rights necessarily

15  depends on the Tribe's right to the tidelands that border on or make up portions of Kiket Island

16  Road.  The Tribe's aboriginal right to the tidelands is "an important issue of federal law that

17  sensibly belongs in a federal court."  See Grable & Sons, 545 U.S. at 315

18  **B.     Complete preemption**

19       There are some claims where the preemptive character of federal law is so strong that it

20  converts an ordinary state common-law complaint into a federal claim.  Metropolitan Life Ins.

21  Co. v. Taylor, 481 U.S. 58 (1987). "Once an area of state law has been completely pre-empted,

22  any claim purportedly based on that pre-empted state law is considered, from its inception, a

23  federal claim, and therefore arises under federal law." Caterpillar Inc. v. Williams, 482 U.S. 386,

24

1    393 (1987).  "The complete preemption doctrine applies when the class of claims by plaintiff is

2    so necessarily federal that removal is always permitted, even if the federal issue is raised as a

3    defense and does not appear on the face of plaintiff's well-pleaded complaint."  Lyons v. Alaska

4    Teamsters Employer Serv. Corp., 188 F.3d 1170, 1172 (9th Cir. 1999).

5         In Oneida Indian Nation v. Cnty. of Oneida, the Supreme Court recognized federal

6    jurisdiction over an action in which the Oneida Indian Nation claimed possession of certain lands

7    under federal law.  414 U.S. 661 (1974).  In finding jurisdiction, the Court distinguished the

8    Tribe's claim from other claims involving rights conferred via federal patents, which do not

9    create federal jurisdiction.  "Rather, it rests on the not insubstantial claim that federal law now

10   protects, and has continuously protected from the time of the formation of the United States,

11   possessory rights to tribal lands, wholly apart from the application of state law principles which

12   normally and separately protect a valid right of possession."  Id. at 677.

13        The Court has subsequently referred to its decision in Oneida as an example of one of the

14   few areas of federal law where preemption converts a state-law claim into a federal one for the

15   purpose of establishing jurisdiction.  A "state-law complaint that alleges a present right to

16   possession of Indian tribal lands necessarily asserts a present right to possession under federal

17   law, and is thus completely preempted and arises under federal law."  Caterpillar Inc. v.

18   Williams, 482 U.S. 386, 393 n.8 (1987) (internal quotation marks omitted).

19        In addition, the Ninth Circuit has cited Oneida for the proposition that "Federal common

20   law governs an action for trespass on Indian lands."  United States v. Milner, 583 F.3d 1174,

21   1182 (9th Cir. 2009).  See also United States v. Pend Oreille Pub. Util. Dist. No. 1, 28 F.3d 1544,

22   1549 n.8 (9th Cir. 1994) ("The Supreme Court has recognized a variety of federal common law

23

24

1   causes of action to protect Indian lands from trespass, including actions for ejectment,

2   accounting of profits, and damages") (collecting cases).

3         In suing the Tribe to quiet title to her property, which lies within the Tribe's reservation

4   and borders the Tribe's tidelands, and for injunctive relief regarding an easement that would be

5   at the very least constrained by the Tribe's rights to the tidelands, Ms. Carney is raising for

6   consideration issues that are necessarily federal in nature, in that they are governed by federal

7   law and important to the federal system. The federal interests in providing a federal forum to

8   determine an Indian Tribe's rights to lands that were recognized by treaty, part of the original

9   reservation, and never alienated or conceded, are sufficiently strong to convert a state-law claim

10  into a federal one for the purposes of jurisdiction.

11        The issues here are distinguishable from cases where courts have declined to find federal

12  preemption. For example, in K2 Am. Corp. v. Roland Oil & Gas, LLC, the Ninth Circuit held

13  there was no federal jurisdiction over a dispute between two Montana corporations involving

14  state-law tort claims regarding an oil-and-gas lease located on Indian trust land. 653 F.3d 1024

15  (9th Cir. 2011). The Court declined to apply complete preemption for several reasons. For one,

16  neither company was an Indian party, so the case had nothing to do with the unique relationship

17  between Indian tribes and the federal government. Id. at 1030. In addition, the plaintiff did not

18  claim ownership of the lease under federal law, and although the plaintiff sought an interest in

19  trust property, its rights turned exclusively on state law. Id. at 1030–31.

20        Given the absence of anything of import to Indian tribes, or of any determinative federal

21  issue, it is not hard to see why the Court rejected a broad rule that would apply complete

22  preemption to "disputes involving trust lands." Id. at1029. See also Safari Park Inc v.

23  Southridge Property Owners Association of Palm Springs, 2018 WL 6843667 (C.D. Cal. Dec. 4,

24

1    2018) (no jurisdiction over trespass action between non-Indians even though alleged trespass

2    occurred on tribal land).  These factors discussed in K2, however, counsel the opposite

3    conclusion here.  The Tribe is a party and seeks to defend its rights to tidelands—aboriginal

4    rights protected by the Treaty of Point Elliott, President Grant's executive order, and federal

5    common law—as well as its rights to the Preserve.  See Oneida Cty., N.Y. v. Oneida Indian

6    Nation of New York State, 470 U.S. 226, 235 (1985) (noting the longstanding recognition by the

7    Supreme Court of the "unquestioned right of the Indians to the exclusive possession of their

8    lands").

9          For all of these reasons, the Court finds that there is federal jurisdiction under the

10   doctrine of complete preemption as to Plaintiff's claims to quiet title and to enforce her rights

11   under an easement, which assert property interests in tidelands held in trust for the Tribe.

12   **II.     Federal Officer Removal**

13         Congress authorized removal for suits against United States agencies or officers under 28

14   U.S.C. § 1442.  One provision of that statute permits removal of any civil action against "A

15   property holder whose title is derived from any [United States] officer, where such action or

16   prosecution affects the validity of any law of the United States."  Unlike the other removal

17   statutes, which courts generally construe against removal, the federal officer removal statute is

18   construed liberally.  See Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 147 (2007).  In

19   addition, removal is proper even if only a defense depends on federal law.  Jefferson County v.

20   Acker, 527 U.S. 423, 431 (1999).  The overriding purpose of the statute is to protect the federal

21   government's ability to carry out its legitimate interests through its agencies and officers and, in

22   particular, to provide a forum for federal immunity defenses.  Id

23

24

1    The Tribe received beneficial title to the Reservation lands and the tidelands from an

2  officer of the United States, through the Treaty of Point Elliot, in 1855, and an executive order

3  issued by President Ulysses S. Grant, in 1873.  In addition, the Secretary of the Interior acquired

4  the Tribe's lands to hold by the United States in trust for the Tribe.  See 25 U.S.C. § 5108.

5  Plaintiff does not contest the Tribe's assertions on these points.  On this basis, it appears that the

6  Tribe meets the first element under § 1442(a)(2).  See Ute Indian Tribe of the Uintah & Ouray

7  Rsrv. v. Ute Distribution Corp., 455 F. App'x 856, 862 (10th Cir. 2012) (title to assets with the

8  tribe derived from the Secretary of the Interior).

9    The second element is satisfied if the action filed in state court "affects the validity of any

10  law of the United States."  This element requires something more than a dispute over the

11  meaning of a federal law.  See Ute Indian Tribe of the Uintah & Ouray Rsrv., 455 F. App'x at

12  862 (no jurisdiction because federal issues "might at most implicate the interpretation of a

13  federal statute, not its validity").  Some courts have required an assertion that a federal law is

14  invalid.  See Veneruso v. Mount Vernon Neighborhood Health Ctr., 933 F. Supp. 2d 613, 632

15  (S.D.N.Y. 2013), aff'd, 586 F. App'x 604 (2d Cir. 2014).  But that somewhat technical

16  interpretation is not required by the text and empowers artful pleading—whether an action

17  against a property holder affects the validity of a federal law does not necessarily depend on the

18  plaintiff or prosecutor declaring that federal law invalid.  It is also not responsive to the structure

19  and purpose of the statute, which has to do with providing a layer of protection from local

20  prejudice for those acting under federal authority so that the federal government can function.

21  See Arizona v. Manypenny, 451 U.S. 232, 242 (1981).

22    If the purpose of the primary officer-removal provisions is to protect the federal

23  government's ability to carry out its legitimate interests through its agencies and officers and

24

provide a forum for federal immunity defenses, <u>Jefferson County v. Acker</u>, 527 U.S. 423, 431 (1999), § 1442(a)(2) serves an adjacent goal, which is to protect the ability of the federal government to confer and administer property to advance policy objectives.  In <u>Town of Davis v. W. Virginia Power & Transmission Co.</u>, the court found jurisdiction where a town filed a condemnation action against a private company that had purchased the subject property with federal grant money from a federal agency.  647 F. Supp. 2d 622, 624 (N.D. W. Va. 2007).  The company's use, management, and disposition of the property were subject to the agency's supervision and control, and the company would have to obtain permission from the agency to sell the property.  <u>Id</u>. at 624–25.  The court found that the goals of the relevant federal regulations—which reserved interests in the property, purchased with federal grants, to the United States—would be frustrated by the condemnation action.  <u>Id</u>. at 627.

Here, there are multiple sources of federal law at issue, and this is the kind of state-court suit that tests their validity because it would evade them or otherwise frustrate their aims. Plaintiff owns alienated fee land within the Swinomish Reservation and asserts claims over land the Tribe claims as its own, as tidelands or as part of the Preserve.  The Tribe's rights are recognized by federal common law, the Treaty of Point Elliott, and President Grant's Executive Order.  And, as with federal officers, the Tribe has tribal immunity unless waived by Congress. <u>Kiowa Tribe v. Mfg. Techs</u>, 523 U.S. 751, 754 (1998).  The purpose of this removal statute is, in part, to provide a neutral forum, "free from local interests or prejudice," so that federal rights such as these receive a fair hearing.  <u>See</u> <u>Arizona v. Manypenny</u>, 451 U.S. 232, 242 (1981).

There are also several federal statutes which together provide a structure Plaintiff's suit seeks to circumvent.  The United States, which holds the Tribe's land in trust, 25 U.S.C. § 5108, does not waive its immunity from an action seeking to quiet title to Indian trust lands.  28 U.S.C.

1   § 2409a(a).  In addition, under 28 U.S.C. § 1360(b), state courts cannot adjudicate "the

2   ownership or right to possession of [Indian trust] property or any interest therein."  These rules

3   protect the rights of tribes to lands held in trust and, in particular, they protect them from contests

4   in state courts.  This action was filed as a state-court suit relating to those lands held in trust,

5   without the United States named as a party.  It seeks to evade these very statutes.  It would

6   therefore affect the validity of these laws and goes against federal policy and interests.  See

7   Oneida Indian Nation of N.Y. State v. County of Oneida, 414 U.S. 661, 668–69 (1974)

8   ("unquestionably it has been the policy of the federal government from the beginning to respect

9   the Indian right of occupancy, which could only be interfered with or determined by the United

10  States.").

11         Because the Tribe derives beneficial title to property from a United States officer and

12  because the present action would affect the validity of at least one federal law, the Court finds

13  removal was proper under 28 U.S.C. § 1442(a)(2).

14                                              ***

15         The Court finds there is federal jurisdiction for this action under 28 U.S.C. §§ 1441(a)

16  and 1442(a)(2).  Therefore, Plaintiff's motion to remand is DENIED.

17         The clerk is ordered to provide copies of this order to all counsel.

18         Dated July 29, 2021.

19

20                                              Marsha J. Pechman
                                                United States Senior District Judge

21

22

23

24

ORDER DENYING MOTION TO REMAND - 15